People v Harris

2026 NY Slip Op 03260

May 26, 2026

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

The People & c., Respondent,

v

Jamien Harris, Appellant.

Decided on May 26, 2026

No. 43

Nicholas T. Texido, for appellant.

Harmony A. Healy, for respondent.

Rivera, J.

[*1]

The issue in this appeal is whether the indictment charging defendant with murder in the second degree should be dismissed, pursuant to CPL 40.40 (2), because defendant had previously pleaded guilty on a separate indictment to criminal possession of a firearm. Contrary to defendant's claim, the murder prosecution is not barred by CPL 40.40 (2) (a) because the two offenses were not part of the "same criminal transaction", and the separate indictments here do not result in the type of multiple, successive or harassing prosecutions that CPL 40.40 is intended to prohibit. Therefore, we affirm the Appellate Division order reinstating the indictment.

I.

On November 21, 2021, police responded to multiple 911 calls involving a person experiencing a mental health episode. Upon arrival at the scene, the officers observed defendant Jamien Harris, naked, with her hands through the broken windows of the front door to a residential home. Subsequent investigation would reveal that defendant lived in this home with her elderly grandmother. Defendant was highly agitated and pleaded with the officers "don't shoot me." Officers explained that they were not going to shoot and tried to calm her. Defendant told the police that she had dragged her grandmother's dead body to the couch underneath the front window and claimed [*2]that someone had broken into the house and killed her while defendant was asleep. Officers approached the window and observed the corpse of an elderly woman with a sheet covering her body. Defendant refused to remove her hands from the shattered windows of the door. Officers obtained entry to the home, and once inside, assisted defendant with getting dressed, handcuffed her, and placed her in an ambulance which took her to the hospital.

Once inside the home, investigators observed that the body was cold to the touch and showing rigor mortis. During a sweep of the home for other victims, officers confirmed that no one else was on the premises and observed that the basement door was locked from the inside. The basement and upstairs were in disarray, broken glass was on the living room floor, and the two front windows were shattered. Officers also observed several weapons during their emergency sweep of the residence, and after obtaining a warrant, they recovered a silver revolver with a black handle near the front door under broken glass; bullets, shotgun shells, a machete, and a baseball bat embedded with glass on the first floor; a semi-automatic pistol in the upstairs hallway; and a disassembled shotgun in one of the bedrooms on the second floor.

Later that evening, at the hospital, defendant made conflicting statements to homicide detectives, at times identifying herself as the shooter, while at other times claiming that someone else had killed her grandmother so that she could "die with dignity." For example, defendant stated that: the various guns in the house belonged to her grandfather, who had passed away the previous summer, and she often played with them, including a silver revolver with a black handle; she had fired two shots from the revolver, one of which may have hit her grandmother; her grandmother had an axe in her hand and was going to hit her when defendant fired the two shots; she may have shot her grandmother but, as she repeated several times, she loved her grandmother and "couldn't hurt her" and "wouldn't have done that"; she didn't mean to shoot her grandmother and she "felt horrible" if she killed her; her grandmother had dementia and she "was happy when [she] thought [her grandmother] died in peace, but when she saw a bullet hole in her . . . body she thought someone shot her"; she moved her grandmother's body after she found her dead; and she heard someone upstairs the night before (November 20) and thought they broke or "snuck" into the house and may have "did a die with dignity" on her grandmother. When pressed by detectives, defendant named one of her sisters and her mother as the possible shooter. Defendant was arrested and charged that same day with two counts of criminal possession of a firearm (Penal Law § 265.01-b [1]), one each for the revolver and pistol.

Prosecutors continued their investigation in the months that followed. Based on the autopsy conducted on November 22, 2021, the medical examiner determined that defendant's grandmother died from a gunshot wound to the chest and declared the manner of death a homicide. Investigating officers spoke with witnesses in the neighborhood concerning the shooting and defendant's erratic behavior, as well as with defendant's relatives, who discussed her prior mental health episodes. A DNA Analysis Report issued by the police forensic laboratory on January 13, 2022 identified three contributors from the samples taken from the three firearms recovered at the house, at least one male and the other two female. The report concluded that defendant's grandmother was likely one of the contributors to the DNA found on the revolver but excluded her as a contributor to the DNA found on the other firearms.

On March 22, 2022, the prosecution presented evidence to a grand jury in support of the two simple possession charges for the revolver and pistol under theories of both actual and constructive possession.FN1 The evidence included testimony and footage from one officer's body-worn camera capturing the officers' approach and entry into the home. With respect to the homicide, the prosecution instructed the grand jury as follows:

"You also heard evidence of a homicide. That evidence was offered for how it may or may not, in your judgment, bear on the issue of possession and whether or not Jamien Harris possessed or otherwise exercised dominion or control over the guns found at [the residence]. It may not be considered for any propensity or anything else, other than how it may or may not bear on your evaluation of possession."

The grand jury indicted defendant on both firearm possession counts.

On June 27, 2022, the prosecution received a Firearms Analysis Report from the police forensic laboratory, which indicated that the silver revolver fired the fatal bullet. On November 2, 2022, the date of a scheduled Huntley hearing to determine the admissibility of defendants' November 21, 2021 statements to law enforcement, defendant pleaded guilty as charged without a negotiated plea agreement.

Prior to the plea colloquy, the prosecutor and defense counsel had a "very lengthy discussion" off the record regarding the effect of the plea on a potential future indictment of defendant for her grandmother's murder. The prosecutor described that discussion as follows:

"Part of that discussion entailed whether or not a plea in this circumstance would foreclose a further prosecution of an unindicted homicide charge. The conduct for which she was indicted on November 21st, 2021, consisted of allegations of simple possession of a firearm. However, part of that investigation also covered the discovery of her grandmother's body which was deceased and the cause of death was determined to be a single gunshot wound to her chest.

As I said, we had a very lengthy discussion about that and whether or not this is a case and these are circumstances that would bar subsequent prosecution for a homicide-related offense. Significant to that is the statutory language that exempts subsequent prosecutions where the evidence relied on was either non-existent or unascertained at the time of the initial indictment. . . . Of significance, subsequent to the indictment, subsequent to the charges of these two possessory offenses, the People developed ballistic evidence that matched a slug recovered from the wall that we believe to be the slug that caused her grandmother's death[.]"

The prosecution then stated that it had no objection to the colloquy prepared by the court to address the possible future prosecution. Defense counsel also confirmed he and his client were amenable to the drafted colloquy: "The colloquy as written is fine with us, your Honor. We have had a chance to go over it. It has all been issues, facts, that have been discussed as we have approached and made this decision."

The court also confirmed defendant's understanding of a potential murder prosecution against her:

"THE COURT: Ms. Harris, do you understand that if we went forward with [the Huntley] hearings and I ruled in your favor, the People would not be able to use those statements or the evidence obtained from your home against you at a trial?

DEFENDANT: Yes.

THE COURT: All right. And you understand that the plea that you're about to enter and the statements that you will make with regard to this plea, that those could be used against you at a subsequent trial?

DEFENDANT: Yes. . . . .

THE COURT: And you understand that your plea of guilty today may not stop the police or the prosecutors from charging you with other crimes that could be related to the charge you're pleading guilty to today?

DEFENDANT: Yes.

THE COURT: You understand that based on the conversations I have had with the People and with your attorney, that one of the crimes that they may charge you with is Murder?

DEFENDANT: Yes.

THE COURT: Do you understand that what you say today could be used against you in that later prosecution?

DEFENDANT: Yes.

THE COURT: Do you understand that your plea of guilty today to Possession of a Firearm could be used against you if the People or the police choose to prosecute you for Murder or some other crime?

DEFENDANT: Yes."

Defendant then pleaded guilty to both counts of the possession indictment.FN2

On March 13, 2023, the prosecution successfully sought permission to collect a buccal swab DNA sample from defendant. The DNA comparative analysis conducted on April 11, 2023, comparing defendant's DNA against samples collected from the revolver, provided what the prosecution described as very strong scientific support that defendant was a contributor to the DNA found on that weapon.

On May 2, 2023, the prosecution presented evidence to a second grand jury charging defendant with murder in the second degree. The evidence included testimony from the same officers that testified before the first grand jury, each of whom recounted substantially similar observations from the crime scene and their discussions with defendant. In addition to a more detailed retelling of defendant's statements to police on November 21, the prosecution also presented the DNA evidence matching defendant to the DNA collected from the murder weapon. The grand jury indicted defendant on one count of murder in the second-degree (Penal Law § 125.25 [1]).

Defendant moved to dismiss the second indictment pursuant to CPL 40.40 (2), arguing that possession of the firearm found at the scene and used to commit the murder was joinable with the murder charge. County Court granted the motion.

The Appellate Division reversed County Court and denied defendant's motion, reinstated the indictment, and remitted the matter to County Court for further proceedings on the indictment (239 AD3d 1279 [4th Dept 2025]). The Appellate Division "conclude[d] that the conduct related to possession of the firearms and that related to the murder involved separate and distinct criminal acts that were not part of the same criminal transaction," and therefore, CPL 40.40 (2) did not bar the murder prosecution (id. at 1281, citing People v Brown, 21 NY3d 739, 751 [2013]). One Justice dissented (id. at 1281-1286), and granted defendant leave to appeal.

II.

A.

Defendant contends that County Court properly dismissed the murder indictment under CPL 40.40 (2) and, as relevant here, argues that the charges were part of the same criminal transaction because there was no break in possession between her use of the weapon in the murder on November 20, 2021 and her possession of the weapon the next day, November 21. The prosecution responds that the passage of time between defendant's completion of the homicide on November 20 and her subsequent apprehension on November 21 while in possession of the firearm used to commit the offense separates the criminal acts into different criminal incidents, allowing separate prosecution of the possession and the murder charges. The prosecution has the better argument. We conclude that the Appellate Division properly denied defendant's motion to dismiss and reinstated the murder indictment.

"The Legislature, . . . dissatisfied with the Federal formulation" of double jeopardy, "adopted in the Criminal Procedure Law . . . what is generally known as the 'same criminal transaction' test" which, "in its purest form, prohibits a second prosecution . . . based on the same transaction as a former one" (Abraham v Justices of New York Supreme Ct. of Bronx County, 37 NY2d 560, 565 [1975], citing Ashe v Swenson, 397 US 436, 448 [Brennan, J., concurring]). CPL 40.40 provides, in part, that "[w]here two or more offenses are joinable in a single accusatory instrument against a person by reason of being based upon the same criminal transaction[,]" that person may not be [*3]separately prosecuted for these offenses if the prosecution is in possession of "evidence legally sufficient to support a conviction" for the uncharged offense and either a trial of the existing charge has commenced or the existing charge is disposed of by a guilty plea (CPL 40.40 [1], [2]). CPL 40.40 (1) incorporates by reference CPL 200.20 (2) (a), which, in turn, incorporates CPL 40.10 (2)'s definition of "criminal transaction[.]" Specifically, CPL 40.10 (2) (a) provides that a " '[c]riminal transaction' means conduct which establishes at least one offense, and which is comprised of two or more or a group of acts . . . so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident." (see also Black's Law Dictionary [12th ed 2024], Incident [defining "incident" as a "discrete occurrence or happening"]).FN3 The Court has explained that "[a]n '[a]ct' is a 'bodily movement' (Penal Law § 15.00 [1]), while '[c]onduct' normally consists simply of 'an act or omission and its accompanying mental state' (Penal Law § 15.00 [4])" (People v Duggins, 3 NY3d 522, 531 [2004]). Further, CPL 40.10 (2) (a) "involves consideration of the nature, timing, and circumstances of the offenses" (see People v Lynch, 25 NY3d 331, 334 [2015] [internal quotation marks and citations omitted]).FN4

At its core, CPL 40.40's same criminal transaction test "prohibits a separate prosecution of joinable offenses that arise out of the same transaction and involve different and distinct elements under circumstances wherein no violation of the double jeopardy principle can validly be maintained but the equities nevertheless seem to preclude separate prosecutions" (People v DeProspero, 91 AD3d 39, 43 [4th Dept 2011] [internal quotation marks omitted], affd 20 NY3d 527 [2013]; see also Richard G. Denzer, Prac Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 40.40, at 142-144 [1971 ed]). CPL 40.40's bar is squarely aimed at avoiding "vexatious multiple prosecutions" and "promot[ing] justice, economy, and convenience" in criminal adjudications (People v Ruzas, 54 AD2d 1083, 1083 [4th Dept 1976], quoting Ashe, 397 US at 454 [Brennan, J., concurring]).FN5

[*4]B.

The question in this appeal is whether the offenses of simple possession of the revolver on November 21 and murder with the revolver on November 20 constitute the same "criminal transaction" because defendant's underlying acts were "so closely related and connected in point of time and circumstances of commission as to constitute a single incident" (CPL 40.10 [2] [a]). The relevant firearm possession charge arose from defendant's possession of the revolver on or about November 21, 2021, the day after the murder of defendant's grandmother. This charge was for "simple" possession, a class of possession offenses distinct from those based on possession with intent to use (compare Penal Law §§ 265.01; 265.01-b [1]; 265.02; with 265.03 [1]; 265.04 [1]).

As we explained in People v Billups, which was decided after the Appellate Division's disposition of the instant appeal, in cases of simple possession, the actus reus of possession is complete when a defendant exercises dominion and control over the firearm and is thus independent of any criminal use, such as shooting at another person (see People v Billups, — NY3d —, —, 2026 NY Slip Op 01589, *3 [2026]). Billups involved a defendant who had obtained a firearm "more than one hour before" a robbery, "carried it across approximately 15 city blocks" and briefly stashed the weapon in a co-conspirator's apartment while "continu[ing] to plan the robbery," and then ultimately wielded the weapon during the underlying crimes (id. at *1, *3). We assessed whether the simple possession charge could be sentenced consecutively to concurrent robbery and felony murder charges despite the overlapping elements between those offenses. Although Billups involved consecutive sentencing under Penal Law § 70.25, and here we are concerned with the CPL 40.40 (2) (a) prohibition on multiple prosecutions for various offenses arising from the same criminal transaction, Billups is nonetheless instructive as to whether the "point in time" and "circumstance[s] of commission" of the possessory offense are "closely related" to the substantive crime (CPL 40.10 [2] [a]).

In Billups, we concluded that in the context of convictions for simple possession and a crime involving use of that weapon, "[e]valuating whether a defendant's acts were separate and distinct" for consecutive sentencing purposes "requires a different analytical approach due to the 'heightened level of integration between the possession and the ensuing substantive crime for which the weapon was used' " (id. at *2, quoting People v Wright, 19 NY3d 359, 365 [2012]). While "[t]he 'act' of possession" has been described in some contexts as "by its nature, continuous" (Wright, 19 NY3d at 366), Billups clarified that the act of simple possession generally does not merge with a subsequent crime involving use of the weapon because the actus reus of possession is complete when a defendant exercises dominion and control over the firearm (Billups, 2026 NY Slip Op 01589, *3, citing People v Brown, 21 NY3d 739, 744, 749, 751 [2013]). Because CPL 40.10 (2) (a) analyzes the "circumstances of commission" of an "act" or "group of acts" (id.), and the "temporal proximity" between those acts is crucial to understanding whether they "constitute a single criminal incident" (Duggins, 3 NY3d at 531-532), Billups's analysis of simple weapons possession also informs the meaning of "criminal transaction" for purposes of CPL 40.40 (2) in cases involving separate indictments charging simple possession and a crime involving use of that weapon.

The grand jury indicted defendant on simple possession charges, which required actual, physical possession of the firearms or dominion and control over the location where they were discovered on November 21, irrespective of their use in a separate crime (see People v Manini, 79 NY2d 561, 573 [1992] [defining constructive possession]). Consequently, the differing elements and the circumstances of the commission of these offenses show that defendant's simple possession of the revolver was not part of the same criminal transaction as the murder charge. The possession could have been completed months in advance or on the day after the murder, because the charges defendant pleaded guilty to were possession of the firearms on or about November 21, attaching the possession charges to the moment in time when the officers discovered the illegal firearms, and not the moment of the fatal shooting (see Penal Law § 265.01-b [1] ["A person is guilty of criminal possession of a firearm when [they] . . . possess[ ] any firearm" (emphasis added)]).

Moreover, the prosecution explicitly charged the grand jury on both physical and constructive possession, meaning defendant was only required to have dominion and control over the area where the firearm was located, and further explained that "the firearm need not be loaded but it must be operable," and that "defendant is required to know that [they are] in possession of a firearm, but . . . is not required to know that it was operable." All of the [*5]evidence presented to the grand jury was intended to establish the acts underlying the simple possession offenses. The prosecution did not press the narrative of the murder crime at the first indictment and did not argue that defendant should be charged with possession because she shot her grandmother.FN6 Indeed, because defendant did not obtain the firearm for the purpose of using it in the murder, the two crimes are not unified by a common criminal purpose.FN7

Defendant argues that her claim fits within precedent holding that a defendant's possessory act and substantive crime were part of a single continuum of action. Her argument fails because the simple possession was completed independently, and unrelatedly, to the acts connected to the homicide. The fact that defendant committed the murder with that same weapon does not alone show that these acts were part of the same criminal transaction. Therefore, contrary to the dissent's view, the discovery of the illegal firearms alongside the homicide is not sufficient to tie these offenses together as a single criminal transaction (see dissenting op at 9 n 1, 11-14). This is not a case, for example, where defendant possessed the same gun, on the same day, in different locations, and was charged in different indictments with simple possession treating each location as a separate offense in clear violation of the successive prosecution bar (cf. Matter of Johnson v Morgenthau, 69 NY2d 148, 148-149, 152 [1987] [holding that the prosecution's allegations that the defendant's uninterrupted six-day possession of the same handgun across two counties rendered the possession a single continuing offense, thus barring successive prosecutions for third-degree weapon possession in each county]).FN8 Neither was there any attempt by the prosecution to "divid[e] a single crime into a series temporal or spatial units" (id. at 151).

III.

The dissent unpersuasively claims that our decision will encourage the type of prosecutorial misconduct CPL 40.40 was designed to address (see dissenting op at 14-18). First, the dissent asserts that we have adopted a [*6]categorical rule that simple possession charges are never part of the same criminal transaction as a substantive crime relevant to those charges (see id. at 11-12, 15-17). We adopt no such rule.

Notwithstanding the " 'heightened level of integration between the possession and the ensuing substantive crime for which the weapon was used' " (Billups, 2026 NY Slip Op 01589, *2, quoting People v Wright, 19 NY3d 359, 365 [2012]), it is possible that in certain cases simple possession could form part of the same criminal transaction as a substantive crime, including "where [the simple] possession and the substantive offense occurred virtually simultaneously" (see e.g. Billups, 2026 NY Slip Op 01589, *3 ["where weapon possession and robbery charges arose from one distinct act—" e.g., "the defendant's seizure of a police officer's gun[,]" or "where someone handed [the defendant] a gun just before [they] shot [the victim]—i.e., where the act of possession was simultaneous with the shooting"], citing People v Sturkey, 77 NY2d 979, 981-982 [1991], and People v Brown, 21 NY3d 739, 751-752 [2013]). Here, defendant's own statements to detectives confirmed that she had possession of the firearms well before the homicide. Whether the prosecution has violated CPL 40.40's bar on vexatious prosecutions turns on the particular circumstances of the case, and here there is no evidence that separate indictments were filed to harass defendant.

Second, the dissent claims that our decision incentivizes prosecutors "to always bring a charge of simple possession, rather than a charge of criminal possession with intent to use," and to stack those offenses (see dissenting op at 14-17). Our disavowal of any per se rule undercuts this argument. The dissent assumes that the prosecution would risk dismissal of the second indictment pursuant to CPL 40.40 and the charges alleged therein—no matter how serious, including, as here, murder—on the assumption that the court will automatically deny the defendant's motion. The assumption is unwarranted given that there are external forces that incentivize expeditious investigations and prosecutions, including concerns for public safety and established constitutional proscriptions. As to the latter, defendant did not argue that the pre-indictment delay violated her constitutional rights to prompt prosecution (see People v Singer, 44 NY2d 241, 253—254 [1978] [holding that unreasonable pre-indictment delay may constitute a denial of due process under the State Constitution, and where delay is protracted, the burden shifts to the prosecution to establish good cause]).

Lastly, we disagree with the dissent's suggestion that the prosecution acted in an untoward manner (see dissenting op at 14-18). Murder is a serious offense, and murder investigations often take time and the expenditure of vast resources; defendant's appeal is a good example of why a prosecutor may choose to proceed with a simple possession charge first while law enforcement continues with its murder investigation. Defendant exhibited troubling behavior, and the circumstantial evidence pointed to her as the shooter. Neighbors and family members corroborated that defendant had a history of mental health issues and her statements to the homicide detectives vacillated between confessions of guilt and claims that another family member had killed her grandmother. The prosecution may have determined that, under the circumstances, it was best to proceed on the firearm possession charges given the clear evidence in support of those charges while continuing to investigate the murder.

Nor is this a case where defendant was lulled into believing her plea to simple possession would end the matter. Defendant exercised her statutory right under CPL 220.10 (2) to plead guilty in full satisfaction of the simple possession indictment, in other words, it was defendant—not the prosecution—who drove the procedural posture of the case. When defendant pleaded guilty, the prosecution, defense counsel, the court, and defendant herself were all aware that a murder charge might be forthcoming, and the court confirmed during the plea allocution that defendant was aware of that possibility and that her statements at the plea might be used against her. By pleading guilty to the entire indictment, defendant effectively terminated the first prosecution unilaterally, triggering her ability to file a motion to dismiss under CPL 40.40. The prosecution was not free to dictate whether, when, or how defendant entered her plea, nor even whether they could file a superseding indictment adding the murder charge under CPL 200.80, and any double jeopardy consequences flowing from the sequencing of these proceedings are therefore attributable to defendant's own exercise of that right, not to any prosecutorial overreach.

Plainly, there is no indication that the separate prosecutions here, with the simple possession charges disposed of by defendant's plea before a grand jury separately indicted her on murder, were an attempt at gamesmanship by the prosecution. These simply are not the paradigmatic "vexatious multiple prosecutions" that CPL 40.40 is intended to prevent.

Accordingly, the order of the Appellate Division should be affirmed.

WILSON, Chief Judge (Dissenting):

Ms. Jamien Harris allegedly shot her grandmother with a black and silver handgun on the night of November 20, 2021, and remained inside the house with her grandmother's dead body until the morning of November 21, 2021, when police responded to the scene. That same day, Ms. Harris was charged with criminal possession of a weapon, to which she pleaded guilty 11 months later. From the moment the police arrived at the scene, but surely by the time ballistics evidence showed that the gun in Ms. Harris's possession fired the bullet that killed her grandmother, there was an abundance of evidence to support indicting Ms. Harris for criminal possession of a weapon and murder. Nevertheless, the People did not indict Ms. Harris for murder until 18 months after the incident, 10 months after receipt of the ballistics report, and five months after her guilty plea to criminal possession of a weapon. Ms. Harris moved to dismiss the indictment for murder, contending the People's failure to charge her prior to her guilty plea to criminal possession was a violation of CPL 40.40. I agree—the People did exactly what CPL 40.40 forbids. Therefore, I dissent.

I.

On November 21, 2021, the Buffalo Police Department responded to an address where there was an alleged disturbance involving a woman exhibiting signs of a mental health episode. The officers found Ms. Harris naked, standing inside the home with her hands sticking out through the broken windowpanes of a locked front door. Ms. Harris was hysterical, saying that the officers were there to murder her, and yelling that somebody killed her grandmother. The officers extracted Ms. Harris from the door and seated her on an ottoman inside, next to which a black and silver handgun was located. Ms. Harris pointed the officers to the dead body of her grandmother in the room directly adjacent to the front door. The body had a gunshot wound to the torso, and rigor mortis had already set in. Law enforcement determined that no one else was in the home and that the basement door was locked from the inside. Police later secured a search warrant and collected evidence from the scene, including an additional handgun located inside a laundry basket and a disassembled shotgun upstairs. Law enforcement also interviewed neighbors who stated they heard multiple gunshots from the home the night prior.

Ms. Harris was arrested and brought to an interview with a behavioral health team, during which she alternated between alleging that someone broke into the house while she was sleeping and killed her grandmother, and stating that she had been playing with guns, "did fire one shot in grandmother's direction and it may have hit her." Ms. Harris also stated that the guns in the home belonged to her late grandfather and that she often played with them. Later that same day, November 21, 2021, law enforcement charged Ms. Harris with criminally possessing two firearms in violation of Penal Law § 265.01 (b) (1), one of which was the black and silver handgun.

In March 2022, the People sought and obtained a grand jury indictment charging the criminal possession counts. The indictment read that Ms. Harris "knowingly possessed" two different firearms "on or about the 21st day of November, 2021." On June 27, 2022, the People received a ballistics report showing that the black and silver handgun fired the shot that struck Ms. Harris's grandmother. On November 2, 2022, when the matter was originally scheduled for a Huntley hearing, Ms. Harris chose to plead guilty to the indictment. Before the court entered her plea, the People indicated that they might subsequently decide to charge Ms. Harris with murder.

On March 13, 2023, 16 months after the incident, the People moved for a DNA sample from Ms. Harris. On April 11, 2023, the People received a report providing strong scientific evidence that Ms. Harris was a contributor to the DNA profile recovered on the black and silver handgun. On May 2, 2023, the prosecution charged Ms. Harris with murder in the second degree in violation of Penal Law § 125.25 (1). The indictment read that Ms. Harris, "on or about the 20th day of November, 2021" intentionally caused the death of her grandmother by shooting her. Ms. Harris moved to dismiss the indictment, alleging a violation of CPL 40.40 based on the People's failure to charge her with murder prior to her pleading guilty to criminal possession.

The County Court agreed with Ms. Harris and issued an order dismissing the murder indictment. The court reasoned that the conduct underlying both the criminal possession charges and the murder charge were part of the same criminal transaction, and therefore the separate indictments created piece-meal prosecutions in violation of CPL 40.40. On appeal, the Appellate Division reversed and reinstated the indictment (239 AD3d 1279). The Appellate Division held that "[u]nder the facts and circumstances of this case . . . the conduct related to possession of the firearms and that related to the murder involved separate and distinct criminal acts that were not part of the same criminal transaction" (id. at 1281). A Justice of the Appellate Division dissented and granted leave to appeal.

II.

CPL 40.40 (1) provides that "[w]here two or more offenses are joinable in a single accusatory instrument against a person by reason of being based upon the same criminal transaction . . . such person may not . . . be separately prosecuted for such offenses" (see also CPL 200.20 (2) ["Two offenses are 'joinable' when (a) They are based upon the same act or upon the same criminal transaction, as that term is defined in subdivision two of section 40.10"]). What constitutes the same "criminal transaction," as separately defined by CPL 40.10 (2), is conduct "either (a) so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture." Only the former, conduct "so closely related and connected in point of time and circumstance", is relevant for purposes of Ms. Harris's case. If "one of two or more joinable offenses . . . is charged in an accusatory instrument, and [] another is not charged therein, or in any other accusatory instrument filed in the same court despite possession by the people of evidence legally sufficient to support a conviction of the defendant for such uncharged offense" then once "either a trial of the existing accusatory instrument is commenced or the action thereon is disposed of by a plea of guilty, any subsequent prosecution for the uncharged offense is thereby barred" (CPL 40.40 [2]).

Thus, the Legislature has determined that when the People charge only one offense, despite having legally sufficient evidence regarding another offense that is so closely related and connected in time and circumstance to the charged offense to constitute the same criminal transaction, subsequent prosecution of the uncharged offense is barred once either trial on the charged offense commences or the charged offense is disposed of by guilty plea. Because the criminal possession offense to which Ms. Harris previously pleaded guilty was so closely related in time and circumstance to the second-degree murder offense with which she was subsequently charged, CPL 40.40 bars prosecution of the latter.

A.

CPL 40.40 was a "legislative response to 'a problem that has proved highly perplexing to the United States Supreme Court and other tribunals' " whereby " 'repeated prosecutions for different and factually distinct offenses arising out of the same criminal transaction under circumstances wherein no violation of the double jeopardy principle [could] validly be maintained but the equities nevertheless seem to preclude separate prosecutions' " (People v Ruzas, 54 AD2d 1083, 1083 [4th Dept 1976] [quoting Denzer, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A [1971 ed], CPL 40.40, p 142-144]). In other words, CPL 40.40 is a "statutory extension" beyond federal double jeopardy rules intended "to prevent the inequitable practice of bringing successive, multiple or harassing prosecutions of crimes arising out of the same transaction" (Matter of Carney v Leary, 106 AD2d 176 [3rd Dept 1985]; see also Matter of Auer v Smith, 77 AD2d 172, 189 [1980] ["where the evidence 'against a person is in the prosecutor's hands, he may not—as a player in a game of chance—deal out indictments one at a time"]).

CPL 40.40 has been interpreted as adopting the "same transaction rule" from Justice Brennan's concurrence in Ashe v Swenson (397 US 436 [1970]) (see John J. Barilla, Double Jeopardy: Constitutional Requirements and the New Criminal Procedure Law in New York, 22 Syracuse L. Rev. 969 [1971] [noting CPL "40.40 is most important in light of Mr. Justice Brennan's same transaction rule as it makes the substance of that rule a matter of law in New [*7]York"]). Justice Brennan advocated for a broad view of double jeopardy, which "requires the prosecution, except in most limited circumstances, to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction" (Ashe, 397 US at 453-454 [Brennan, J., concurring]). Indeed, the original 1971 Practice Commentary described CPL 40.40 as accomplishing "what the Supreme Court failed to do" by requiring joinder for "any group of offenses arising from one criminal transaction which are so factually severable as to elude a double jeopardy taboo" (Denzer, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A [1971 ed], CPL 40.40, p 144). In this context, it is no surprise that the legislature broadly defined a "criminal transaction" as conduct "so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident" (CPL 40.10 [2]).

Our Court has never analyzed what constitutes a single criminal transaction for the purpose of CPL 40.40. However, we have, on one occasion, evaluated what constitutes a single criminal transaction in the context of CPL 40.20, and both CPL 40.40 and CPL 40.20 incorporate CPL 40.10 (2)'s definition of criminal transaction. In People v Lynch, we held that the creation of a forged instrument, and the use of that very instrument many months later, was not a single criminal transaction (25 NY3d 331, 334-336 [2015]). Still, the Court noted that "[a] closer case might be presented had defendant [committed those acts the] same day" because "[i]n such circumstances, the timing and criminal purpose of the two acts would be more interrelated" (id. at 336).

Lower court determinations of what constitutes a single criminal transaction more directly consider the issue at hand. In People v Williams, the defendant stole a car in one county, and was apprehended four days later in another county, where he was charged with criminal possession of stolen property (People v Williams, 123 Misc 2d 165, 166 [Sup Ct 1984]). The defendant pleaded guilty to criminal possession of stolen property, and the trial court thereafter dismissed the robbery charge, because it found the offenses to be part of the same criminal transaction (id. at 167). The court explained that it "[i]f two offenses based on the same transaction are sufficiently related, a second prosecution is barred, notwithstanding the fact that the earlier prosecution was for the less serious offense," particularly so because "the State . . . had full knowledge of the facts and circumstances of the [] robbery when it chose to proceed with the lesser charges" (id. at 173; see also People v Tabor, 87 AD3d 829, 830-831 [4th Dept 2011] ["We agree with defendant that, where the evidence against a person is in the prosecutor's hands, he or she may not—as a player in a game of chance—deal out indictments one at a time" (internal quotation marks omitted)]; People v Cole, 306 AD2d 558, 560 [3d Dept 2003] ["Inasmuch as the drug charges were joinable and the People possessed sufficient evidence to sustain those charges at the time of commencement of the prior trial, prosecution of the charges is barred by CPL 40.40"]; People v Ballacchino, 126 Misc 2d 610, 611 [NY City Ct 1984] ["The People should have joined the trespass and assault charges to begin with and the Court will not put the Defendants in a worse position than they now occupy in order to remedy the People's mistake"])

In Ms. Harris's case, the November 20, 2021, murder and the November 21, 2021, criminal possession are "so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident" (CPL 40.10 [2]). The police arrived at the scene to find the dead body of Ms. Harris's grandmother and Ms. Harris in possession of a black and silver handgun that later turned out to be the murder weapon. Just as the offense of robbery and possession of that which was robbed were held to be a part of the same group of offenses for the purpose of CPL 40.40 in Williams, so must murder and possession of the murder weapon here. This is especially so given all conduct is alleged to have occurred within a 24-hour period, and Ms. Harris is not alleged to have left the home between the murder and law enforcement's arrival. To classify these offenses as separate, rather than part of the same criminal incident, flies in the face of what CPL 40.40 was intended to protect against—successive, multiple or harassing prosecutions of crimes arising out of the same transaction.FN1

The majority's reliance on People v Billups is misplaced (People v Billups, --- NY3d ---, ---, 2026 NY Slip Op 01589 [2026]). Billups discusses simple possession in the context of consecutive sentencing under Penal Law § 70.25, not in the context of CPL 40.40 (2)'s prohibition on multiple prosecutions for various offenses arising from the same criminal transaction. The majority claims that "Billups is nonetheless instructive as to whether the 'point in time' and 'circumstance[s] of commission' of the possessory offense are 'closely related' to the substantive crime (CPL 40.10 [2] [a])" (majority op at 12). But Billups makes no reference to or reliance on the definition of a "single criminal transaction" under CPL 40.10 (2). The majority cannot import the language of CPL 40.10 (2) onto Billups after the fact and then analogize to Billups to define the decision points in CPL 40.10 (2), a statutory definition not relevant to Billups in the first place. The majority alleges it may nonetheless do so because "Billups's analysis of simple weapons possession also informs the meaning of 'criminal transaction' for purposes of CPL 40.40(2) in cases involving separate indictments charging simple possession and a crime involving use of that weapon" (majority op at 13). That is not so. In Billups we held that "in cases of simple possession, the relevant inquiry is when the act of possession was complete"—if the "People proffered sufficient evidence to conclude that the defendant obtained 'dominion and control' over the weapon before committing the substantive crime," then the crimes may be sentenced separately (2026 NY Slip Op 01589, *3). But whether the act of simple possession is "complete" for the purpose of consecutive sentences is irrelevant to whether that act of simple possession is so closely related in time and circumstances to a larger "group of offenses" such that the charges "aris[e] from one criminal transaction" (Denzer, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A [1971 ed], CPL 40.40, p 144). Whereas consecutive sentencing analysis merely focuses on whether the offenses are composed of distinct "acts," CPL 40.40 is expressly designed to prohibit the successive prosecution of separate acts. The question of whether offenses are "factually severable" is immaterial to the episodic analysis that CPL 40.40 instead requires (Denzer, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A [1971 ed], CPL 40.40, p 144). Two charges may often be distinct enough such that they can be sentenced consecutively, and yet so similar in time and circumstance that they may not be prosecuted separately. Charges for simple possession of a weapon and for a substantive crime that very same weapon was used to commit are the prime example of that circumstance. The Legislature's decision to sentence simple possession crimes separately than the crime committed with said weapons says nothing regarding whether the Legislature also intended the People to be able to try those offenses separately.

The majority holds that because the People chose not to charge Ms. Harris with simple possession on the day she actually shot her grandmother, but instead charged her with possession on the day after, her "simple possession of the revolver was not part of the same criminal transaction as the murder" (majority op at 14). Thus, the majority justifies its holding on the ground that the People "attach[ed] the possession charges to the moment in time when the officers discovered the illegal firearms, and not the moment of the fatal shooting" (majority op at 14). There are several flaws in the majority's analysis. First, the majority's position again incorrectly maps Penal Law § 70.25's distinct "act" analysis onto CPL 40.40, when CPL 40.40 instead requires an episodic evaluation regarding a group of offenses. Second, in characterizing the events in this way, the majority continues to forget, and even defy, the purpose of CPL 40.40. By allowing the People to almost always bring a simple possession charge separately from the rest of the criminal transaction for which that weapon was used, the majority enables "the inequitable practice of bringing successive, multiple or harassing prosecutions of crimes arising out of the same transaction" that CPL 40.40 was intended to prevent FN2. Of course, the People could just as readily have charged Ms. Harris with simple possession on the day she shot her grandmother or possession at any point in time with the intent to use unlawfully, in which case even the majority's analysis would bar the separate prosecution of the homicide after the conviction for firearms [*8]possession. These options highlight the fundamental incompatibility of the majority's decision with the legislature's intent. Under the majority's interpretation, the People could today charge Ms. Harris with possession of a firearm on each day before the shooting going back to the first moment at which she said she had "played with" the gun, several weeks before the police arrived. CPL 40.40 was designed to prohibit such prosecutions, which is conceptually indistinguishable from what happened here.

B.

The People also possessed the "evidence legally sufficient to support a conviction of [Ms. Harris] for [second-degree murder]" before the criminal possession charges were "disposed of by a plea of guilty," making "any subsequent prosecution for the [second-degree murder] offense [] thereby barred" (CPL 40.40 [2]). "The standard for reviewing the legal sufficiency of evidence in a criminal case is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (People v Contes, 60 NY2d 620, 621 [1983] [internal quotation marks omitted]).

Law enforcement found Ms. Harris alone in a locked house with her grandmother's dead body beside her. Neighbors provided statements that they heard gun shots from the house the night prior. There was no evidence that Ms. Harris left the house between the murder and law enforcement's arrival, nor evidence that any other individual had come and gone during that period of time. At the precinct, Ms. Harris stated that she was playing with a gun, that it fired a shot in her grandmother's direction, and that it may have hit her. One detective testified that Ms. Harris definitively said, "I think the gun that killed grandma was the gun that I played with." Indeed, ballistic evidence later characterized the gun that Ms. Harris admitted to playing with as the murder weapon. Based on this evidence, all of which existed at least months prior to Ms. Harris's guilty plea to criminal possession, a rational trier of fact could have found the essential elements of the murder in the second-degree beyond a reasonable doubt.

Put simply, when the police find a person shot to death in a home, rigor mortis setting in, one other resident in the home in possession of a gun, no one else present and the doors locked, the People have more than sufficient evidence to charge that other resident with murder—even without her statement that she was playing with a gun and may have shot her grandmother, and even without any ballistic or DNA evidence FN3.

III.

Despite having legally sufficient evidence to convict Ms. Harris for second-degree murder of her grandmother as of November 21, 2021, when they arrived on the scene and Ms. Harris made incriminating statements, or at the very least as of June 2022 when the People received a ballistic report identifying the black and silver handgun which Ms. Harris possessed as the murder weapon, the People waited until May 2023 to bring the murder charge. The People also inexplicably waited until March 2023, more than a year after the crime was committed, to even collect and test a DNA sample from Ms. Harris. Contrary to the majority's view, this case is not "a good example of why a prosecutor may choose to proceed with a simple possession charge first while law enforcement continues with its murder investigation" (majority op at 18). It is a good example of unexplained prosecutorial delays to the detriment of a defendant. The People "had full knowledge of the facts and circumstances of the [murder] when [they] chose to proceed with the lesser charges" (People v Williams, 123 Misc 2d 165, 173 [Sup Ct 1984]) and "the Court [should] not put the Defendant[] in a worse position than they now occupy in order to remedy the People's mistake" (People v Ballacchino, 126 Misc 2d 610, 611 [NY City Ct 1984]).FN4

Moreover, the majority's decision is incompatible with the aim of CPL 40.40's double jeopardy provisions. "Double [j]eopardy [] is not [meant to be] such a fragile guarantee that prosecutors can avoid its limitation by the simple expedient of dividing a single crime into a series of temporal or spatial units" (Brown v Ohio, 432 US 161, 169 [1977]). And yet, after the majority's decision today, the People are incentivized to always bring a charge of simple possession, rather than a charge of criminal possession with intent to use, and to bring said charge first and separately. As in this case, the People can always charge constructive possession of a weapon when someone is found in a home, office, car or other space even if the weapon is not near the person and use that prior conviction against defendants when the People eventually charge the substantive crime. The majority's holding gives the People a reason to split weapons possession charges from actual or attempted crimes involving use of that weapon whenever the weapon is not both acquired immediately before and disposed of immediately after its use—a situation that rarely occurs in practice FN5. The majority's decision thus encourages the very piece-meal prosecutions that CPL 40.40 expressly forbids.

Finally, despite the majority's assurances otherwise, the majority's decision may also inadvertently permit defendants to be prosecuted repeatedly, even continuously, for simple possession of the same weapon. If what made the simple possession charge distinct here is that the People "attach[ed] the possession charges to the moment in time when the officers discovered the illegal firearms, and not the moment of the fatal shooting," nothing stops the People from attaching possession charges for additional moments in time, such as a second simple possession charge for the day before Ms. Harris used it to shoot her grandmother, and the day before that, and the day before that. If simple weapon charges are secured to a "moment in time," such that each moment represents a single criminal transaction, then a defendant "[c]ould be subject to more than 1,100 charges of unlawful possession and imprisonment for the rest of his life" (Matter of Johnson v Morgenthau, 69 NY2d 148, 151 [1987]). That cannot be what the legislature intended when it enacted CPL 40.40. The majority maintains that our case law "forecloses successive and continuous prosecutions for possessory offenses" and that its decision "do[es] not retreat from that established rule, which has no application to defendant's case" (majority op at 16 n 8). And yet, the majority also goes to great lengths to explain that although "the 'act' of possession has been described in some contexts as by its nature, continuous, Billups clarified that the act of simple possession generally does not merge with a subsequent crime involving use of the weapon because the actus reus of possession is complete when a defendant exercises dominion and control over the firearm" (majority op at 13). The majority cannot both claim that the simple possession and murder offenses at issue are not part of the same criminal transaction because simple possession offenses are attached to a "moment in time" (majority op at 14), and thus not continuous in nature, and yet that its opinion cannot be read to alter continuous prosecution for possessory offenses. Because a possessory crime is continuous regardless of the number of consecutive days over which the possession occurred, the majority's observation that Ms. Harris "obtained dominion and control over both the pistol and the revolver before the homicide because she wanted to 'play' with them' " should be legally irrelevant (see majority op at 15 n 7). Put differently, if we accept the majority's contention that Matter of Johnson holds that continuous possession over many days is a single offense that cannot be broken into different moments in time and charged separately, Ms. Harris's possession of the gun happened during that continuous possession, and therefore was necessarily "so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident." If you chase two rabbits, you catch neither.

[*9]* * *

The charges against Ms. Harris—for criminal possession of a weapon and homicide—stem from a single criminal transaction. In one breath, Ms. Harris explained "I think the gun that killed grandma was the gun that I played with." The People's failure to charge Ms. Harris with homicide prior to her guilty plea to criminal possession of the handgun was a violation of CPL 40.40's guarantee against piece-meal prosecutions. The indictment for murder should have been dismissed.

Order affirmed. Opinion by Judge Rivera. Judges Garcia, Singas, Cannataro and Halligan concur. Chief Judge Wilson dissents in an opinion, in which Judge Troutman concurs.

Decided May 26, 2026

Footnotes

Footnote 1

The prosecution represents that it sought to indict defendant on the criminal weapons possession counts in March 2022 to satisfy speedy trial restrictions.

Footnote 2

Defendant is currently living in the community under probation supervision.

Footnote 3

The double jeopardy doctrine's prohibition on successive prosecutions traces to ancient common law, finding expression in the pleas of autrefois acquit and autrefois convict, which prevented reprosecution after a verdict, and the "same evidence" test, which asked only whether proof of one offense would necessarily prove another (see generally Jay A. Sigler, A History of Double Jeopardy, 7 Am J Legal Hist 285, 285—297 [1963]; see also 4 Blackstone, Commentaries on the Laws of England at 329-332 [Dublin ed 1770); 2 Hawkins, 2 Pleas of the Crown at 515—529 [Curwood ed, 8th ed 1824]). In the 1960s the American Law Institute's Model Penal Code (MPC) departed from that formalism, organizing its successive prosecution bar around the conduct underlying the offenses rather than their formal elements, and warning that piecemeal prosecution of a single course of conduct rendered criminal punishment "a function of the number of statutory violations into which [a] defendant's conduct [could] be parsed by a clever pleader" (MPC Commentary, Part I, at 104 [1985]). New York's Bartlett Commission drew heavily on the MPC in drafting the Criminal Procedure Law, enacted in 1970, and the successive prosecution bar in the 1967 study bill was drawn explicitly from the MPC (§ 1.07 [2]; Staff Comment, 1967 Proposed CPL, at 56). As enacted, the CPL refers to "criminal transaction" and CPL 40.20 (2) inverts the common law default, declaring that a person "may not be separately prosecuted for two offenses based upon the same act or criminal transaction," a deliberate departure from the prevailing American rule that had treated separate prosecution as the norm (Denzer, Prac Commentary, McKinney's CPL 40.20 [1971 ed.] at 106-107; see 397 US 436, 453—454 [1970] [Brennan, J., concurring]).

Footnote 4

Not at issue here, CPL 40.10 (2) (b) also encompasses conduct "so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture." This provision has traditionally been used in cases involving conspiracy, complex fraud, larceny or narcotics trafficking (see e.g. People v Lynch, 25 NY3d 331, 335 [2015]; Matter of Schmidt on Behalf of McNeil vRoberts, 74 NY2d 513, 519-520 [1989]; People v Abbamonte, 43 NY2d 74, 82-84 [1977]; Matter of Abraham v Justices of N.Y. Supreme Ct. of Bronx County, 37 NY2d 560, 566-567 [1975]).

Footnote 5

Judge Bellacosa described CPL 40.40 as "not strictly a double jeopardy provision" but rather a "Chancellor's equity provision to bar unfair practices" and protect against "official, governmental harassment and the enormous prosecutorial powers of state and federal governments" (Joseph W. Bellacosa, Prac Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 40.40, at 244 [1981 ed] [internal quotation marks omitted]).

Footnote 6

Given that defendant's claim fails at this first step of a CPL 40.40 (2) analysis—because the charges do not involve the same criminal transaction—we need not proceed to the second step to assess whether, prior to defendant entering plea, the prosecution possessed evidence legally sufficient to convict defendant on the murder charge. Nor is it necessary to resolve the parties' disagreement as to whether legal sufficiency for purposes of CPL 40.40 (2) is measured from when the earlier indictment issues or when the defendant pleads guilty or trial commences.

Footnote 7

The dissent ignores this point and argues that because the possessory offense and the homicide are "alleged to have occurred within a 24-hour period, and Ms. Harris is not alleged to have left the home between the murder and law enforcement's arrival" these offenses "must" be part of the "same criminal incident" (see dissenting op at 9) . In doing so, the dissent collapses these two offenses into one another, and neglects that these offenses are not "so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident" (CPL 40.10 [2] [a]). The defendant obtained dominion and control over both the pistol and the revolver before the homicide because she wanted to "play" with them. Later, she was discovered with one of those weapons and her deceased grandmother and admitted that one of the guns she was playing with discharged and struck her grandmother. Ignoring the distinct actus rei and mens rea, circumstances of commission, and temporal proximity between these offenses is a fundamental flaw in the dissent's analysis, and explains, in part, the dissent's mistaken conclusion that the simple possession and murder were part of the same criminal transaction.

Footnote 8

The dissent's reliance on Matter of Johnson is misplaced (see dissenting op at 16-17). Johnson forecloses successive and continuous prosecutions for possessory offenses (see Johnson, 69 NY2d at 151 [Petitioner's six-day possession of the handgun was continuous and consequently multiple prosecutions were prohibited], citing United States v Jones, 533 F2d 1387, 1390-1392 [6th Cir 1976], cert denied 431 US 964 [1977] [defendant's three-year possession of a weapon was a continuing course of conduct which could only support one prosecution]). We do not retreat from that established rule, which has no application to defendant's case.

Footnote 1

The majority contends that I ignore the fact that "because defendant did not obtain the firearm for the purpose of using it in the murder, the two crimes are not unified by a common criminal purpose" and "the distinct actus rei and mens rea, circumstances of commission, and temporal proximity between these offenses" (majority op at 14-15). Those contentions highlight the majority's error. As to the first point, the majority has confused CPL 40.10 (2)'s subsections (a) and (b). Subsection (b), which the majority themselves note is not at issue in this case (see majority op at 14 n 6), concerns separate criminal acts that are "so closely related in criminal purpose or objective." Subsection (a) would be superfluous if it also required a close relationship in criminal purpose. Instead, subsection (a) covers separate criminal acts that are not closely related in purpose, but instead are "closely related and connected in point of time and circumstance." A correct reading of subsection (a) also disposes of the majority's second point: nowhere does CPL 40.10 (2) consider the actus rei or mens rea of offenses to decide whether they are part of the same criminal incident. The majority improperly adds these elements in order to force the consecutive sentencing analysis from Billups, which does consider actus rei and mens rea, onto a court's evaluation of CPL 40.40.

Footnote 2

It does not matter if "here there is no evidence that separate indictments were filed to harass" Ms. Harris (majority op at 17). Double jeopardy violations are not permitted just because they were not intended to harass.

Footnote 3

The majority observes that Ms. Harris may have possessed the firearms "well before the homicide" (majority op at 17). She was not indicted for possession on any of those days, so the majority's observation is relevant only insofar as it highlights that, under its theory, the People could have separately prosecuted her for possession on any one—or every one—of those days, which is flatly incompatible with CPL 40.40.

Footnote 4

The prosecutor's statements when Ms. Harris pled guilty to simple possession, stating that the People might later pursue a homicide charge, are not relevant to the interpretation of CPL 40.40. If they were, it would be a simple matter to negate the statute by informing defendants in advance that the People were planning to violate it.

Footnote 5

Although "it is possible that in certain cases simple possession could form part of the same criminal transaction as a substantive crime" because the simple possession occurs "virtually simultaneously" with the substantive offense (majority op at 16-17), the point is that those instances are exceedingly rare, and the majority's decision incentivizes law enforcement to bring the simple possession charges first and separately if they believe there is even a chance that the simple possession could be interpreted as not simultaneous to the substantive offense, either because the defendant possessed the firearm a bit before the crime, or continued to possess it a bit after. CPL 40.10 (a)'s melding of "point in time and circumstance of commission" avoids having to decide just how long a "bit" might be, because "circumstance of commission" allows for the consideration of time in a case-specific context.